

**SIGNED this 03 day of June, 2010.**

_____
John C. Cook
**UNITED STATES BANKRUPTCY JUDGE**
_____

### IN THE UNITED STATES BANKRUPTCY COURT FOR
### THE EASTERN DISTRICT OF TENNESSEE
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **In re** | ) | |
| | ) | |
| **LUIS H. RIVAS d/b/a The Forex Project** | ) | No. 08-12333 |
| | ) | Chapter 7 |
| **Debtor** | ) | |
| _____ | ) | |
| | ) | |
| **W. GREY STEED, TRUSTEE** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | Adv. No. 08-1137 |
| | ) | |
| **PAMELA MORGAN a/k/a** | ) | |
| **PAMELA GREEN** | ) | |
| | ) | |
| **Defendant** | ) | |

## M E M O R A N D U M

This proceeding is before the court on the trustee's complaint seeking the avoidance and recovery of alleged fraudulent transfers and an unauthorized postpetition transfer made by the

1

debtor, Luis H. Rivas, to the defendant, Pamela Morgan. Having considered the evidence presented at trial, together with the arguments of the parties, the court now makes its findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

### I.

### A.

An involuntary bankruptcy petition was filed against the debtor on May 15, 2008, and an order of relief was entered on June 10, 2008. The trustee is seeking to recover (1) certain prepetition cash transfers made by the debtor to the defendant from the period September 26, 2007, through May 12, 2008, totaling $250,100, (2) the value of a 2008 Volkswagen Toureg automobile that was purchased by the debtor and transferred to the defendant, (3) the value of two rings allegedly purchased by the debtor and transferred to the defendant, (4) the value of certain furniture allegedly purchased with funds of the debtor and transferred to the defendant, (5) two furs allegedly purchased by the debtor and transferred to the defendant, and (6) a postpetition transfer in the amount of $225,000 made by the debtor to the defendant.

### B.

The evidence presented at trial established that, as early as March 2007 and lasting until May 2008, the debtor, doing business as the Forex Project, operated a huge Ponzi scheme. A Ponzi scheme is a fraudulent scheme in which the scheme operator solicits investments, usually with the promise of high returns, and then uses funds obtained from new investors to make payments to earlier investors. Also, it is common for the Ponzi scheme operator to divert investors' funds to the operator's personal use and benefit in order to present a facade of great wealth and success, which is designed to attract even more new investors. The debtor's scheme in this case

consisted of obtaining funds from investors based on the representation that he would use the funds to trade in the foreign currency exchange market. In obtaining funds from numerous investors, the debtor issued at least 468 fixed rate promissory notes in the aggregate principal amount of $27,019,178 between January 24, 2007, and May 7, 2008. The returns promised for those who invested with the debtor varied from 3% per month to 10% per month with most of the investors being promised a return on their investments of 5% per month, or 60% per year. For example, the debtor issued at least 406 fixed rate promissory notes in the aggregate principal amount of $21,712, 985 at a 60% annual rate of return, thirty fixed rate promissory notes in the aggregate principal amount of $781,305 with a 36% annual rate of return, and at least nine fixed rate promissory notes in the aggregate principal amount of $1,805,000 with a 120% annual rate of return. The debtor promised to pay the interest stated in the notes on a monthly basis with the principal to be repaid at the end of the terms of the notes.

It is clear that, from the very beginning of the fraudulent scheme, the debtor had no intention of investing the bulk of funds he received. Rather, it was the debtor's plan to use present investors' money to make payments to prior investors and to divert the investors' money to himself and others. The evidence showed that the debtor spent an enormous amount of the investors' money funding his extravagant lifestyle, and he also gave expensive gifts and cash to a number of people who were his associates and employees. Examples of the debtor's spending during the period he operated the Ponzi scheme are payments out of his accounts of $2,803,466 in cash, $383,685 for clothing and shoes, $544,216 for furniture, $99,972 for entertainment, $134,630 for jewelry, $72,011 for limos, and $6,090 for lingerie.

The proof revealed that, of all the investor funds received by the debtor in the approximate amount of $27,019,178, the debtor invested only about 19% of those funds, or approximately $5,068,000, in the foreign currency exchange market. The remaining 81% of the money was used to further the Ponzi scheme and for the personal benefit of the debtor and others. Excess funds received by the debtor from investors versus funds the debtor actually invested increased from $498,240 in April 2007 to $28,479,790 in May 2008. From January 2007 through May 2008, the gross profits, including commissions and fees, that the debtor earned investing the $5,068,000 totaled only $3.5 million. During that same period, accrued interest payable on the promissory notes owed to investors increased to $6,743,766 by May 2008. Of that amount of accrued interest, the debtor made interest payments over that same period totaling approximately $3,617,552, leaving a balance owed on accrued interest as of May 2008 in the approximate amount of $3,126,214.

Because the debtor invested only a small amount of the funds received from investors in the foreign currency exchange market, and because the debtor spent the bulk of those funds on himself and others and to keep the Ponzi scheme afloat, the debtor did not have the cash to pay the promised interest and principal payments to investors when the number of new investors started declining during the early part of 2008. It was at that point that the Ponzi scheme began to fail and eventually the involuntary bankruptcy petition was filed against the debtor.

The trustee's evidence established that the debtor became insolvent in April 2007 within the meaning of the Bankruptcy Code, 11 U.S.C. 101(32)(A), and the debtor remained insolvent until the filing of the bankruptcy petition. According to the trustee's expert, Myles McDonald, the insolvency deepened from $259,898 at the end of April 2007 to $26,935,800 at the end of

4

May 2008. While the defendant contended that the trustee's expert left out some of the debtor's assets in calculating insolvency, the degree of insolvency was so great from April 2007 until May 2008 that the few omitted assets mentioned by the defendant were not material to the insolvency calculation. Moreover, the defendant mentioned some assets such as cars, accounts in names other than the defendant, and assets possibly belonging to the defendant's former wife that were not shown to be assets of the debtor. In short, the proof was abundant and clear that the debtor was insolvent from April 2007 to the end of May 2008.

## C.

The defendant met the debtor in 2006. At that time, the defendant was employed at a real estate company. The debtor invited the defendant and her husband to take his course on trading in the foreign currency exchange market. Some time thereafter, the defendant began an intimate relationship with the defendant and, at some point in 2007, she divorced her husband. The defendant eventually became pregnant with the debtor's child, and the child was born in January 2008. Also, during 2007, the defendant began working for the defendant. Beginning in June 2007, the defendant started receiving from the defendant weekly paychecks of $1,000. However, some time in December 2007, the defendant stopped doing any work for the debtor. Although her weekly paychecks ceased around the middle of December 2007, she resumed receiving weekly paychecks of $1,000 in March 2008. In all, the defendant received $31,000 in salary during the period June 2007 until May 2008. The trustee is not in this proceeding seeking to recover the $31,000 in salary that was paid by the debtor to the defendant. The defendant testified that she deposited her salary checks in a joint personal account that she shared with the debtor at Regions Bank, formerly known as AmSouth Bank, and that any money that she would have withdrawn

5

from that account would have included the money she put in as salary. The bank records reflect, however, that, after October 2007, there were insufficient amounts in that joint account from which the defendant could have received any transfers attributable to her salary.

In addition to her salary checks, from September 20, 2007, through May 12, 2008, the defendant received substantial sums of cash from the debtor's accounts, all of which were either checks signed by the defendant or withdrawals made by the defendant. The cash transfers that the trustee is seeking to avoid total $250,100 and are listed on the trustee's Exhibit No. 6. That exhibit also includes copies of the actual checks and debit memos evidencing the transfers to the defendant. The defendant had no recollection of the specific cash transfers made to her other than a transfer on October 12, 2007, in the amount of $60,000 and two transfers of $50,000 and $20,000 made to her on December 31, 2007.

With respect to the $60,000 transfer, the defendant testified that she withdrew the sum from one of the debtor's business accounts upon instructions from the debtor, and she handed him the money for use at one of the debtor's seminars. With respect to the two transfers totaling $70,000 made to the defendant on December 31, 2007, the defendant testified that these funds were sent to Latvia to try out a new trading platform for the debtor's business and that all the funds were lost except $18 that was left in the account. During cross-examination, however, the trustee impeached the defendant's testimony by producing bank records from a Bank of America account that the defendant opened in her name on December 29, 2007, in Conyers, Georgia, that showed the $50,000 was deposited by the defendant into her personal account on December 31, 2007. Although the bank records reflect that the defendant used that account over the next several months, the defendant testified that she had forgotten about that account. That testimony

6

was not credible and it undermined the defendant's testimony that she withdrew $60,000 in cash from the debtor's account and turned the money over to the debtor for use at a seminar. The records reflect that the defendant received numerous cash payments from the debtor over and above her salary, and there are no records to substantiate that the $60,000, $20,000, and $50,000 payments were anything other than direct cash payments made to her by the debtor for her use and control. The only exceptions are three transfers listed on Exhibit No. 6 on the dates September 26, 2007, October 19, 2007, and May 12, 2008.

With respect to the cash transfer made to the defendant on September 26, 2007, from the AmSouth/Regions account in the amount of $2,000 and the cash transfer made to the defendant on October 19, 2007, from the same account in the amount of $3,000, those transfers may have been the defendant's own money since she deposited a number of her payroll checks into that account. With respect to one of the $10,000 transfers listed on May 12, 2008, it appears likely that the $10,000 cash transfer on that date was used to purchase a cashier's check in the same amount that was paid to the defendant on that same date. Hence, it appears that the defendant received only one $10,000 transfer on May 12, 2008.

The trustee is also seeking to avoid the transfers of several items of property that the debtor allegedly transferred to the defendant during the two years prior to the filing of the involuntary petition and while the debtor operated his Ponzi scheme. On December 24, 2007, the debtor purchased a 2008 Volkswagen Toureg for $82,266.83 and gave it to the defendant as a gift. On June 11, 2008, after the filing of the bankruptcy petition, the defendant traded in the Toureg for a 2007 Mazda RX8 and received cash for the trade-in totaling $25,100. Later that

7

same month, the defendant wrecked the Mazda and received a $22,000 insurance check, which the defendant's former attorney is currently holding.

During this same period, the debtor purchased and gave to the defendant an engagement ring worth $11,000. The defendant testified that the engagement ring, and another ring which belonged to the debtor worth approximately $3,000, were stolen some time after May 2008.

Likewise, during this same period, the debtor either purchased furniture that he gave to the defendant or the defendant purchased furniture using money from the defendant's accounts. Shortly following the filing of the involuntary bankruptcy petition, the defendant sold a portion of this furniture at auction for $9,821.50. These funds are currently being held by the trustee pending a resolution of this adversary proceeding.

There was also proof that the defendant possesses two furs. The defendant testified, however, that she purchased the furs for approximately $900 using her own money, and that the furs were not given to her by the defendant.

Around the time the involuntary bankruptcy petition was filed against the debtor, he closed down all of his operations and fled. On May 19, 2008, after the bankruptcy petition was filed, the defendant received a $225,000 cashier's check purchased with funds from one of the debtor's accounts. The defendant deposited that check into her Bank of America account in Conyers, Georgia, and then later used that money to purchase a home.

The debtor subsequently pled guilty to a federal indictment that was based on his fraudulent Ponzi scheme. One count to which he pled guilty related to the $225,000 transfer that he made to the defendant on May 19, 2008.

## II.

### A.

The trustee seeks to avoid and recover most of the transfers described above under provisions of the bankruptcy law that permit the recovery of fraudulent transfers.* These laws "generally attempt to protect creditors from transactions which are designed, or have the effect, of unfairly draining the pool of assets available to satisfy creditors' claims, or which dilute legitimate creditor claims at the expense of false or lessor claims." 5 COLLIER ON BANKRUPTCY ¶ 548.01[1][a] (16th ed. 2010). Fraudulent transfer laws aim "to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away." *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV,* 229 F.3d 245, 250 (3d Cir. 2000).

The trustee seeks to avoid the transfers pursuant to § 548(a)(1)(A) of the Bankruptcy Code, which reads, in pertinent part:

> The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made . . . on or within two years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> > (A) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date such transfer was made . . . indebted.

11 U.S.C. § 548(a)(1)(A). With only a few exceptions, the court finds that all of the transfers at issue in this proceeding were transfers of an interest of the debtor in property made to the defendant within two years of the filing of the bankruptcy petition. The exceptions are (1) the

---

* The trustee also seeks to avoid the transfers utilizing Tennessee's fraudulent transfer statutes. Because the federal law is applicable to all the transfers at issue here, it is not necessary to consider the application of state law.

$2,000 check dated September 26, 2007 drawn on the AmSouth/Regions account that might have come from defendant's salary check, (2) the $3,000 cash withdrawal from the AmSouth/Regions bank account that might have come from the defendant's salary check, (3) the $10,000 cash withdrawal on May 12, 2008, that was apparently used to purchase the $10,000 cashier's check on that same date, (4) the ring worth $3,000 that belonged to the debtor rather than the defendant, and (5) the two furs purchased by the defendant for approximately $900 utilizing her money.

With respect to the other transfers made by the debtor to the defendant, the critical question under § 548(a)(1)(A) of the Bankruptcy Code is whether the proof established that the transfers were made by the debtor with "actual intent to hinder, delay, or defraud" creditors. The court finds that the evidence did indeed establish that the prepetition transfers made by the debtor to the defendant were made with the requisite fraudulent intent. The proof was overwhelming that the debtor operated a massive Ponzi scheme in which he obtained funds from investors that he fraudulently diverted to himself and others, including the defendant. In perpetrating the Ponzi scheme, the debtor had to know that the money from investors would eventually run out and that the extravagant payments and gifts that the debtor was making to himself and others, including the defendant, would contribute to the eventual collapse of the scheme. Knowledge that future investors will not be paid is sufficient to establish actual intent to defraud those investors. *See Liebersohn v. Campus Crusade for Christ, Inc.( In re C.F. Foods, L.P.),* 280 B.R. 103, 111 (Bankr. E.D. Pa. 2002); *Rafoth v. First Nat'l Bank (In re Baker & Getty Fin. Servs., Inc.)*, 98 B.R. 300, 308 ( Bankr. N.D. Ohio 1989), *aff'd*, 974 F.2d 712 (6th Cir. 1992). Other than the exceptions noted above, the court finds that the proof established by a preponderance of the evi-

dence that all of the prepetition transfers made by the debtor to the defendant, namely $235,100 in cash transfers, the 2008 Volkswagen Toureg automobile, the engagement ring, and the furniture sold at the auction, were transfers made by the debtor with intent to defraud his creditors within the meaning of 11 U.S.C. § 548(a)(1)(A).

All of the transfers avoidable under § 548 (a)(1)(A) of the Bankruptcy Code are also avoidable pursuant to the trustee's alternative theory of recovery under § 548(a)(1)(B) of the Bankruptcy Code. That section provides, in relevant part:

> The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made . . . on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> . . . .
>
> (B)(i) received less than reasonably equivalent value in exchange for such transfer . . .; and
>
> (ii) (I) was insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer.

11 U.S.C. § 548(a)(1)(B). The evidence established that the debtor was insolvent at all relevant times with respect to the transfers at issue. The proof also established that all of the prepetition transfers avoidable pursuant to §548(a)(1)(A) were made by the debtor to the defendant without any reasonably equivalent value being received by the debtor in exchange for the transfers. The evidence established that the defendant received $1,000 per week as salary during the time period June 2007 until May 2008, even though she no longer worked as an employee of the debtor's after December 2008. In addition to the regular salary, the defendant received prepetition cash payments or cashier's checks of $235,100 from September 2007 through May 12, 2008, from the debtor. The proof established that the defendant did not perform services that

11

provided an economic benefit to the debtor that was reasonably equivalent to the cash payments being paid to her over and above the salary she was receiving. Also, the evidence established that the defendant did not give the debtor reasonably equivalent value in exchange for the gifts of the 2008 Volkswagon Toureg, the engagement ring, and the furniture sold at the auction. Accordingly, the court finds that cash transfers to the defendant in the amount of $235,100 together with the gifts of the car, the engagement ring, and the furniture sold at the auction are fraudulent transfers that the trustee may avoid under the terms of 11 U.S.C. § 548(a)(1)(B).

Transfers that are avoided under § 548 of the Bankruptcy Code can be recovered by the trustee pursuant § 550(a) of the Bankruptcy Code. That section reads, in pertinent part:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section . . . 548 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property, from—
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a). In this proceeding, the debtor was the initial transferee of all of the transfers of money or property to be avoided. An initial transferee must have dominion over the funds or property to be an initial transferee and the legal right to put the money or property to one's own purposes. *See Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528, 533-35 (6th Cir. 2003).

The defendant contends that the $60,000 in cash she received on October 12, 2007, was given to the debtor for use in connection with a seminar, and that the $20,000 and $50,000 transfers that she received on December 31, 2007, were sent to an investment platform in Latvia. As such, the defendant appears to contend that she was a "mere conduit" for those funds. However,

12

on cross-examination, it became apparent that the $50,000 transfer made in December 2007 was not sent to Latvia but was deposited in the defendant's Bank of America account in Conyers, Georgia. Accordingly, and due to the lack of evidence corroborating that the $60,000 was given to the debtor and that the $20,000 transfer was sent to Latvia, the court cannot find that the defendant had mere temporary possession of the funds as agent for the debtor. The defendant was the initial transferee.

Pursuant to § 550(a) of the Bankruptcy Code, the trustee may recover the property transferred or its value. The court will award judgment for the $235,100 in cash transfers that the debtor made to the defendant prepetition. The court cannot award the Volkswagen Toureg because it was traded in for the purchase of another automobile, cannot award the ring because it has been stolen, and cannot award the furniture because it has been sold. Therefore, the court will award a money judgment for the value of the Toureg at the time of the transfer, which the court finds was $82,266.83; the value of the ring, which the court finds was $11,000.00; and the value of the furniture, which was $9,821.50.

**B.**

Finally, the court turns to the postpetition transfer made from one of the debtor's accounts to the defendant. After the bankruptcy filing, the debtor transferred to the defendant the sum of $225,000 by a cashier's check, which the defendant used to purchase a house. The trustee seeks to avoid that transfer under the provisions of § 549(a) of the Bankruptcy Code which reads:

> (a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate–
>
>   (1) that occurs after the commencement of the case; and

        (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or

        (B) that is not authorized under this title or by the court.

11 U.S.C. § 549(a). The exceptions provided in (b) and (c) of the statute are inapplicable here, and the court did not authorize the postpetition transfer to the defendant nor was it authorized under any provision of title 11 of the Bankruptcy Code. Accordingly, the trustee may avoid the postpetition transfer of $225,000 to the defendant under 11 U.S.C. § 549, and may recover from the defendant, as initial transferee, the value of that transfer under 11 U.S.C. § 550(a)(1).

### III.

For the foregoing reasons, the court will enter a judgment in favor of the trustee and against the defendant that avoids the transfers that have been identified herein as being avoidable under § 548 or § 549 of the Bankruptcy Code, and that awards to the trustee a recovery from the defendant of the following amounts: (1) $235,100.00, representing the avoided prepetition cash transfers made by the debtor to the defendant from the period September 26, 2007, through May 12, 2008, (2) $82,266.83, representing the value of a 2008 Volkswagen Toureg automobile that was purchased by the debtor and transferred to the defendant, (3) $11,000.00, representing the value of the engagement ring purchased by the debtor and transferred to the defendant, (4) $9,821.50, representing the value of the furniture purchased by the debtor or with the debtor's funds and transferred to the defendant, and (5) $225,000.00, representing the postpetition transfer made by the debtor to the defendant.

# # #